BERRY COAL & COKE CO., Respondent, v. CHICAGO, PEORIA & ST. LOUIS RAILWAY CO., Appellant.

St. Louis Court of Appeals, January 16, 1906.

1. COMMON CARRIERS: Successive Carriers: Contract of Affreightment: Evidence. A final carrier cannot be held liable for the default by a previous carrier in the performance of the original contract of affreightment in the absence of evidence to show that the final carrier was a connecting carrier or handled the property under the original contract.

2. ———: ———: ———: Conflict of Laws. Where property is received outside of this State for shipment through successive carriers into this State, the shipment is not covered by the law of this State.

3. ———: Shipwreck: General Average: Lien for Contribution. The owner or master of a ship is entitled to contribution from the owners of the cargo towards paying expenses incurred in the saving of the ship and cargo from destruction by perils solely incident to navigation and unmixed with negligence on the part of the owner or the crew; for such contribution the shipowner has a lien on the cargo.

4. ———: ———: ———: ———: Bonds. The usual method of enforcing such lien is to take a general average bond from the owners of the cargo whereby they agree to pay their respective parts of such expense when the same is adjusted.

5. ———: Successive Carriers: Carriers' Lien: Notice. A final carrier may withhold the delivery of goods to the consignee

Coal & Coke Co. v. Railroad.

until the payment by the latter of a lien claimed by a prior carrier, where the lien asserted is connected with the transporation of the property and essential to the conveyance from the point of shipment to the destination, unless the final carrier has notice or knowledge of some fact which would make the claim unlawful.

6. ——: ——: ——: ——. If the final carrier in such case has notice that the claim for lien of a previous carrier is illegal he cannot enforce the lien; but he is not bound to investigate at his own expense the origin of the lien asserted against the property in transit by a preceding carrier.

7. ——: Shipwreck: General Average Bond. Where the owner of a vessel incurs expense in saving the vessel and cargo from the peril of shipwreck, a part owner of the cargo, by executing a general average bond to pay his part of such expense when the same shall be adjusted, is not precluded from setting up in defense of liability on the bond that the peril or wreck was incurred through the negligence of the owner of the vessel.

8. ——: Successive Carriers: Shipwreck: General Average Bond. Goods were shipped from another State into this State through successive carriers, one of which was a steamer, and the steamer, having incurred expense in saving the vessel and cargo from shipwreck, sent, with the shipment to the final carrier, a general average bond with instructions to deliver the goods when the bond should be signed by the consignee. The consignee refused to sign the bond and the goods while in the custody of the final carrier were destroyed by the act of God. The final carrier had no notice that the peril of the vessel, to escape which the expense was incurred, was caused by any negligence of the owner; *held*: the consignee in an action against the final carrier for the conversion of the goods could not recover.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough,* Judge.

REVERSED AND REMANDED.

*Eleneious Smith and Douglas W. Robert* for appellant.

The defendant is charged with the liability of a connecting carrier. In order to render it liable as such it must be shown that the goods were received by it under the original contract, or that there was some traffic

agreement between the initial carrier and the one charged as a connecting carrier. The defendant, in all events, had the right to require the consignee to sign the average bond before delivering the cement. Sweeney v. Thompson, 39 Fed. 121; Ins. Co. v. Parker, 2 Pick. 1; Lee v. Grinnell, 5 Duer. 400; Phummer v. Wildman, 3 M. & S. 482; Job v. Langton, 6 Ell. & Bl. 779; Moran v. Jones, 7 Ell. & Bl. 523; Hall v. Jansen, 4 Ell. & Bl. 409; 3 Kent's Com. 239; McAndrew v. Thatcher, 3 Wall. 347; Jacobson Marine Com. 348; Article by Mr. Carver, 8 L. Q. R. 229; Hobson v. Lord, 92 U. S. 397.

*Robert L. McLaran* and *William K. Koerner* for respondent.

The right to general average contribution is peculiar to the maritime law and is possessed solely by carriers by water. Ralle v. Troop, 157 U. S. 386, 39 L. Ed. 742; Sourmith v. The J. P. Donaldson, 27 Fed. 671; The Congress, Fed., Cas. 3099; Crooks v. Allan, 5 Q. B. D. 38. The owners of a vessel cannot claim general average contribution if the loss, to avert which the sacrifice was made, was one which would ultimately have fallen upon themselves. In other words, if the ship owners would have been liable to plaintiff, had the goods been lost by reason of the accident in question, then they can not claim general average contribution. Lowndes on General Average, pages 30-34, and cases cited; Conrad v. DeMontcourt, 138 Mo. 311. Carriers of merchandise by water are insurers and liable for every loss or damage to the merchandise unless it happens by reason of an "Act of God," the public enemy, or by some other cause or accident specifically excepted in the contract of shipment. Steamship Co. v. Ins. Co., 129 U. S. 397, 32 L. Ed. 788; Ins. Co. v. The Lady Pike, 88 U. S. (11 Wall.) 114; The Maggie Hammond, 76 U. S. 435; The Niagara v. Cordes, 62 U. S. 7; Costigan v. Tran. Co., 33 Mo. App. 289; Hutchinson on Carriers, page 198, sec. 170.

STATEMENT.—Both the parties to this action are incorporated companies. Plaintiff, under the name of Berry Coal & Coke Company, is the successor of the Berry-Horn Coal Company, and as such owns all the rights and interests of its precedessor. This action is in form trover, and was brought to recover damages alleged to have been suffered by the conversion of 1,360 sacks of cement, known as Alpha-Portland Cement, an article manufactured at Alpha, New Jersey. The petition states that on May 11, 1903, the Alpha-Portland Cement Company consigned to the plaintiff's predecessor, the Berry-Horn Coal Company, for delivery at East St. Louis, Illinois, 1,360 sacks of cement, to be carried by lake and rail, in care of the Lehigh Valley Railroad Company, the Atchison, Topeka & Santa Fe Railroad Company and the Chicago, Peoria & St. Louis Railroad Company, the defendant. That the consignor delivered the cement to the Lehigh Valley Railroad Company at Alpha, New Jersey. The petition further states that about June 1, 1903, this defendant, the Chicago, Peoria & St. Louis Railroad Company, received said cement and undertook, pursuant to said consignment and as the last carrier in the line of transit, to deliver the cement to the Berry-Horn Coal Company at East St. Louis, Illinois; that after the expiration of a reasonable time for arrival at destination, plaintiff demanded the cement of the defendant and defendant refused and still refuses to deliver it. The petition charges that the value of the cement at East St. Louis at the time it should have been delivered, was $850, and prays damages to that amount.

The answer, besides a general denial, contains these averments: The Lehigh Valley Railroad Company delivered the cement mentioned in the petition, at Buffalo, New York, on board the steamer Seneca, a vessel owned by the Lehigh Valley Transportation Company, for water transportation to Chicago, Illinois; on May 18, 1903, the steamer went aground in the St. Clair river with the cement on board and constituting part of the

cargo; it became necessary to lighter the cargo and use tugs to release the steamer, and to incur expense in so doing; the owners and master of the steamer incurred such expense and the steamer and cargo were thereby saved; the Lehigh Valley Railroad Company received the cement from the steamer Seneca at Chicago, May 22, 1903, said company being instructed by the Lehigh Valley Transportation Company, the owners of the steamer, not to deliver the cement to the consignee at East St. Louis, Illinois, until said consignee had signed a general average bond, agreeing to pay its part of the expense of rescuing the vessel; said bond was delivered to said Lehigh Valley Railroad Company at the time it received the shipment; the Lehigh Valley Railroad Company delivered the shipment to the Atchison, Topeka and Santa Fe Railroad Company at Chicago with a like instruction and accompanied by the average bond; the railroad company last named delivered the cement to this defendant with the same instruction and the same bond; the cement arrived at East St. Louis May 29th, loaded in two cars and, thereupon defendant presented plaintiff, as successor of the consignee, the Berry-Horn Coal Company, the average bond and requested plaintiff to sign it, tendering plaintiff the sacks of cement on condition that it signed the bond. Plaintiff refused to sign and defendant continued to hold the cement ready for delivery whenever the bond was signed. Afterwards, and while in defendant's custody, the cement was destroyed by an overflow of the Mississippi river. The averments of the destruction of the property by the flood are not material to the questions before us, and need not be cited; as there is a concession that the destruction occurred through the act of God. The answer further states that after all but a small part of the cement had been destroyed, plaintiff agreed to sign the average bond, provided the cement had not been injured by the flood.

The reply was a general denial.

For the plaintiff there was testimony going to show the purchase of the cement, its cost and value. This was practically all the evidence for the plaintiff. At the conclusion of it, the defendant requested the court to declare that under the pleadings and evidence it was not entitled to recover; but the court refused the request.

Certain facts were agreed to by the parties, the substance of which is as follows: The cement was received May 18, 1903, on board the steamer Seneca, at Buffalo, for transportation by water to Chicago, Illinois. The steamer sailed from Buffalo on said date at 12:05 a. m., bound for its port of destination. The voyage was prosperous until May 19th at two o'clock a. m., at which time the steamer "was running on the range at the head of the southeast bend of the St. Clair river." While at that point of her voyage, the steamer's steering gear refused to work on the starboard side. The auxiliary steering gear was put into force, but before the vessel could be stopped, she went aground at Squirrel Island Point. "The vessel was found to be out three feet six inches forward and one foot aft." The Master immediately sent to Detroit for lighters and a tug, which arrived the next day and the vessel was lightered of about 600 tons and thereby released so she could proceed on her voyage at 5:20 a. m. She moved up the St. Clair river, came to anchor at 6:15 a. m. and immediately started to reload the cargo, which was put aboard by 7:15 p. m. on that day. It was found on examination of the hull and water bottom, that a number of the frames were broken and the shell plates corrugated. The owners and masters of the vessel became liable to the owners of the tug and lighters for the services of the latter vessels in aiding the Seneca, and also become liable and promised to pay for services rendered in repairing the vessel; all of which liabilities the owners of the Seneca subsequently paid. By the use of the tug and lighters the Seneca and all its cargo were saved, and but for the use of them both would have been lost. The steamer arrived at Chi-

cago, May 22, 1903, and, thereupon, its owner, the Lehigh Valley Transportation Company, delivered the cement to the Atchison, Topeka & Santa Fe Railroad Company at Chicago, and at the same time delivered to said railroad company the two waybills accompanying the shipment, with this direction written on each: "680 bags of cement, under protest; property not to be delivered until attached average bond is signed by the consignee. Return bond to E. J. Henry, Agt. L. V. T. Co." The average bond was attached to the waybills. The Atchison, Topeka & Santa Fe Railroad Company, carried the cement to Pekin and there delivered it to the Chicago, Peoria & St. Louis Railroad Company, at the same time delivering said average bond and the waybills containing the instruction that the cement was not to be delivered until the average bond was signed.

On May 23, 1903, John A. Whiteside, Master, Reynolds Hill, Engineer, and S. P. Campbell, Mate, executed a protest before a notary public in the county of Cook, State of Illinois, stating the charges for the cement to be $68.40 on each 680 sacks or $136.80 on the whole shipment of 1,360 sacks, and that the property was not to be delivered until the average bond was signed by the consignee. The protest contained the details in regard to the going aground of the Seneca and her rescue by lightering the cargo, as we have stated them. On the waybills was a notation of the advances on the cement to the amount of $136.80, to be collected from the consignee before delivery of the property. It was further agreed that the average bond and protest, and the direction on the waybills regarding the condition and delivery of the property, were made by the Lehigh Valley Transportation Company, the owner of the steamer Seneca. The average bond was as follows:

"Whereas, it being represented that the steamer Seneca, whereof J. A. Whiteside is, or lately was Master, having on board a cargo of general merchandise in which we are interested as owners, shippers or con-

signees, sailed from port of Buffalo on or about the eighteenth day of May, 1903, bound for Milwaukee and Chicago, and in the course of her said voyage, the steamer grounded at southeast bend of St. Clair River, May 19, 1903, and it became necessary to lighter cargo and use tugs to release the steamer, and certain other expenses were entered into, and that thereby certain losses and expenses were incurred, and other further losses and expenses, consequent thereon, may yet be incurred, and that such losses and expenses may be a charge by way of general average or otherwise, upon the vessel, her freight and cargo, or either of them.

"Now, therefore, we, the subscribers, owners, shippers or consignees of such of the cargo of said vessel as we have severally described and set opposite our respective signatures hereto, in consideration of the premises and of the delivery to us respectively of such cargo, or so much thereof as may be saved, without retention pending an adjustment of said losses and expenses, do hereby, for ourselves, our respective executors and administrators, severally and respectively but not jointly, nor the one for the other, covenant and agree to and with the Lehigh Valley Transportation Co., owners or agents of the owners of the said vessel and with one another, that the losses and expenses aforesaid, or so much thereof, as upon an adjustment of the same to be stated by Mather & Co., Adjusters of Averages, according to the laws and usages of this port in similar cases, may be shown to be a charge upon the said cargo, or upon any of the cargo of said vessel which may be received by us, shall be paid by us, respectively, according to our several and respective parts or shares thereof, unto the said Lehigh Valley Transportation Company, when such adjustment is completed and due notice given thereof.

"Provided, however, that if any of said cargo has been shipped under bills of lading containing an agreement that the York Antwerp Rules shall be the rules of adjustment, such agreement shall not be affected hereby,

but in all other respects this bond shall remain in full force.

"And we further promise and agree to furnish said adjusters, upon their request, all information which they may deem necessary to a correct adjustment of this case.

"This bond may be executed in several parts of like tenor and date, the whole of which are to constitute but one bond, with the same effect as if each of said parts were severally signed by us.

"In witness whereof, we have to these presents respectively set our hands, in the city of . . . . this . . . day of . . . . one thousand, nine hundred and . . . ."

The above is, in substance, all the evidence adduced in the case. The waybills were attached to the stipulation regarding the facts, but their contents, further than stated, are not important.

After refusing a declaration of law for a finding in favor of the defendant, the court gave a declaration for the plaintiff which imported that plaintiff was entitled to recover unless the grounding of the Seneca was not due to negligence on the part of her owners, or crew, and that if she grounded because her steering gear, for some unexplained reason, failed to work properly, plaintiff was entitled to recover. The court as trier of the fact, entered judgment in favor of the plaintiff for $951.15; to which, and to rulings on requests for declarations, the defendant excepted at the time. The defendant had tendered $103.43 to plaintiff as the proceeds received by defendant for that portion of the cement not ruined by the flood.

An appeal from the judgment was allowed to this court.

GOODE, J. (after stating the facts).—No bill of lading or contract of affreightment was put in evidence, nor was there any proof regarding that contract. The

answer, however, says the cement was delivered to the Steamer Seneca by the Lehigh Valley Railroad Company and the agreed facts show it passed from the Seneca, or its owner, the Lehigh Valley Transportation Company, into the custody of the Atchison, Topeka & Santa Fe Railroad Company for further transportation, and then into the custody of the defendant. But it does not appear whether the reception of the property by the several carriers was under separate and distinct contracts between them and the Alpha-Portland Cement Company, as shipper, or under the original bill of lading between the consignor and the initial carrier, the Lehigh Valley Railroad Company. Neither is it shown that the different carriers had any traffic arrangement or association of interests which would warrant the holding that they received the cement, not as independent, but as connecting carriers. The waybills are before us, but a waybill is a very different document in legal effect, from a bill of lading. A waybill goes with the shipment and shows the routing, freight charges and such matters; whereas a bill of lading represents the property itself in many ways, contains the contract of affreightment and largely fixes the respective rights of the carrier, the shipper and the consignee. We grant that a waybill, though it is not the instrument which embodies the affreightment contract, might contain notations or statements which would tend to show the shipment was a through one and uphold the conclusion, as against the carrier which made the notations, that the different companies over whose lines the property had passed, transported it as connecting carriers. But the only reference to a connecting line on the waybills which accompanied the cement, refers to no line but the Leigh Valley Railroad Company. There is not a minute or notation of any kind to show the Lehigh Valley Transportation Company was a connecting carrier with the defendant and the other railway lines over which the property was conveyed. Beyond the reference on the

waybills to the Lehigh Valley Railroad Company, we know nothing of the relation to each other of the several companies which handled the cement, either in their general business or in respect of the particular shipment. For aught that is shown, the company which owned the Seneca may have acted independently in transporting the shipment and pursuant to a separate contract between it and the consignor. To hold a final carrier liable for defaults by previous carriers in the performance of the contract of carriage, on the theory that the final carrier was a connecting one and handled the property under the original contract of affreightment, some evidence to that effect must be adduced. [Wyman v. R. R., 4 Mo. App. 35; Nanson v. Jacob, 12 Mo. App. 125, 93 Mo. 331, 6 S. W. 246; Shewalter v. R. R., 84 Mo. App. 589; White Com. Co. v. R. R., 87 Mo. App. 330.] This was an interstate shipment and not governed by the Missouri statutes, the property having been received by the first carrier outside of this State. The defendant received the property in question from an intermediate carrier, with a positive direction not to deliver it to the consignee until the latter executed the general average bond in favor of another intermediate carrier, the Lehigh Valley Transportation Company. The position taken by the plaintiff is that it was not bound to sign the bond, because the stranding of the steamer Seneca in the St. Clair river was due, not to a peril of navigation, but to the negligence of the owners or the crew of the vessel. The cause of the grounding of the steamer was the failure of its steering gear to work. The argument is that this failure was a circumstance from which the court, as trier of the fact, was justified in drawing the inference that the accident to the vessel was due to negligence for all the consequences of which the owners of the vessel were responsible; not to a maritime peril which entitled those owners to general average from the owners of the cargo toward defraying the expenses incurred in rescuing the vessel and making

such repairs on it as are subject to general average. A great deal is said in the briefs on the question of whether as matter of law, such an accident is regarded as one resulting from a peril of navigation, or may be found as a fact to have been due to negligence. We deem it unnecessary to go into that question; because, in our opinion, the right of the defendant to exact the average bond of the plaintiff before delivering the cement, does not depend on it. It is the law that the owner of a vessel cannot enforce contribution in the nature of general average, from the owners of the cargo, to defray expenses incurred in rescuing the vessel from a peril encountered, not as incident to navigation, but from bad seamanship, or from the vessel being unseaworthy. [Lowndes, Gen. Av. (5 Ed.), sec. 4 p. 28, et seq.; Conrad v. DeMontcourt, 138 Mo. 311, 39 S. W. 805.] If the Seneca had carried the cement to destination, and the dispute over the average bond had arisen between its owners and the plaintiff, the question of whether the ship and cargo were endangered by a maritime peril or by defective construction or unskilful handling, might be decisive of the owner's right to exact an average bond. We do not say it would be even then; for the point is irrelevant under the facts and we need not decide it. Now there can be no doubt, that the owner or master of a ship is entitled to contribution from the owners of the cargo, toward paying expenses incurred in saving the ship and cargo from destruction by perils solely incident to navigation and unmixed with negligence on the part of the owner or the crew. [Lowndes, Gen. Av., sec. 1, p. 19.] For such contribution the ship owner has a lien on the cargo. [Id., sec. 77, p. 327, et seq.] It follows that if the Seneca fell into peril as a natural incident of her voyage, her owner was entitled to general average from the various owners of the cargo toward making up the expense necessarily incurred in saving her and the cargo, and had a lien on

each portion of the cargo for its proportion of the expense. The methods of enforcing this lien are requiring a deposit of money or an average bond from the respective owners of the cargo, before their goods are delivered. The usual mode nowadays is by taking an average bond. [Lowndes, chap. IX.] The custom of requiring such a bond, developed from the fact that when a rescued vessel arrives at destination, where the cargo ought to be delivered, the amount of contribution due from the different owners of the cargo cannot be ascertained at once, so that payment may be made before delivery. The amount due from each must be computed; and in order to retain to the shipowner the benefit of his lien pending the computation and to allow the consignees to get their goods at once, an average bond is taken from the consignees, by which they agree to pay their several portions of the expense when ascertained according to the rules governing general average. Sometimes a consignee may desire to make a deposit sufficiently large to cover his portion in any event, and this he may do. The consignee is further protected in that he cannot be compelled to execute an average bond containing unreasonable terms. [Conrad v. De Montcourt, supra.] In the present case the plaintiff offered no objection to the terms of the bond, nor did it ask to make a deposit in lieu of giving bond. Neither does it now prefer any objection to the bond further than that it could not lawfully be demanded, for the reason that the expense to which plaintiff was asked to contribute, was due to the negligence of the crew or owner of the steamer Seneca, and was not subject to general average. Indeed, within a fortnight after plaintiff had refused its signature to the bond, it wrote the defendant offering to sign if, meanwhile, the cement had not been injured by the high waters. This demonstrates that plaintiff waived any objection to the terms of the instrument. Therefore it cannot maintain the position that it rightly refused to sign at first and the defendant wrongly refused to deliver the property until it signed,

unless the law excused it from signing because the wreck of the Seneca was due to negligence and the expense thereby entailed fell exclusively on the owner of the vessel. If the defendant was not bound to investigate the causes of the disaster to the Seneca in order to ascertain whether it might withhold the cement until the bond was executed, we need inquire no further nor look into the question of the cause of the wreck. The defendant, as final carrier, knew nothing of the circumstances which gave rise to the demand by the Lehigh Valley Transportation Company for an average bond. If defendant had known as a fact, or had had good reason to believe, the wreck was due to the negligence of the crew in managing the vessel, or of the owner of the vessel in sending it on a voyage when unseaworthy, possibly defendant would have been bound to take notice that plaintiff could not be called on for general average contribution, and would have been guilty of conversion in withholding the cement from plaintiff until the bond was signed. [Steamboat Va. v. Kraft, 25 Mo. 76, 81; Wells v. Thomas, 27 Mo. 17; White v. Vann, 6 Humph. (Tenn.) 70, 73.] Defendant neither knew nor had reason to believe the disaster to the steamer was due to any cause which would invalidate the claim for contribution from plaintiff as owner of a portion of the cargo, but had every reason to believe the contrary. The bond contained recitals adapted to show the casualty was due to a natural maritime peril. These questions occur: When does the illegality of a lien claimed by a prior carrier against a shipment, entitle the consignee to demand the shipment from the final carrier without discharging the lien? To what extent, in ordinary circumstances, is the final carrier bound, at his peril, to ascertain the legality of the claim? What is the law concerning those matters in the special instance of a claim for general average? Those inquiries presuppose that the shipment was not shown to have been transported under a through bill of lading and that the different carriers were not shown to constitute

one connecting line by virtue of some traffic arrangement or association. This assumption is made, not because we hold it to be an essential element of the decision, but because the facts in the record justify it, and we wish our judgment to be no broader than the case requires. We answer in the first place that the charge for which the lien is asserted, must be one connected with the transportation of the property and essential to its conveyance from the point of shipment to destination; for it is only for such charges that a carrier's lien exists. [Steamboat Va. v. Kraft, 25 Mo. 76.] If the charge of the previous carrier possesses this character, then the final carrier is justified in paying it and holding the property according to any lawful directions given for the enforcement of the lien, unless the final carrier has notice or knowledge that, in the particular instance, the charge is unlawful; either as being extortionate or for some other reason. We answer further that the final carrier must act in good faith toward the consignee; and it is for this reason that if he had knowledge or notice of the illegality of the charge by an intermediate carrier, he will not be sustained in advancing it or enforcing the lien. [Armstrong v. Railroad, 62 Mo. App. 639.] It is not incumbent on the final carrier to investigate, at its own trouble and expense, the merits of an apparently just claim preferred by the preceding carrier. We apprehend that this would be true whether the lien was asserted by virtue of the law of the land, or of the sea, as in the case at bar, or of business usage, or of a habit of business between the parties. In the Armstrong case, supra, the plaintiff, a wheat buyer, had entered into an agreement with an elevator company, to clean, mix and load his wheat into cars for a stipulated charge. Under the arrangement, the defendant railroad company would stop plaintiff's cars of wheat at the elevator, and when they were cleaned, the elevator company would return them to the railroad company. A great many cars had thus been handled, the railroad company paying the ele-

vator company its charges for cleaning the wheat. In the course of the business, one car received from the elevator company by the railroad company was found, on reaching destination, not to have been cleaned by the elevator company. Thereupon the plaintiff refused to reimburse the railroad company the charge paid by it for the cleaning. After stating it to be a carrier's duty to see that previous charges on property in transit are reasonable before paying them, the opinion declared the railroad company, as a common carrier, was under no duty to ascertain by inspection, before receiving the cars of wheat from the elevator company, whether the wheat had been cleaned; but in the absence of knowledge to the contrary, had the right to presume it had been.

A statute of this State gave a lien on a steamboat to a person furnishing supplies or stores under contract with a master or owner of the boat. [R. S. 1845, p. 98.] In defense of an action to enforce such a lien, it was contended that the party who contracted for the supplies was not the master or owner of the boat; but the Supreme Court held that the person furnishing them was not bound to investigate that matter on pain of forfeiting his lien. [Steamboat Lehigh v. Knox, 12 Mo. 508.] The decision is germane to the point in hand.

In White v. Vann, 6 Humph. 70, Vann had received from persons operating a railroad as lessees, property belonging to White, to be carried from the terminus of the railroad to Knoxville. Vann paid said lessees certain charges, claimed by them against the goods, for freight transportation. There was proof of a custom on the part of interstate common carriers in the United States, to advance, for the benefit of the owners of the goods in transit, previous charges for freight and storage. But it appeared White had a contract with the lessees of the railroad, according to which said lessees had already been paid for transportation of said property. For this reason White asserted the lessees were entitled to no lien and that Vann was not justified in ad-

vancing the freight. At the trial the presiding judge charged that Vann was entitled to be reimbursed for advances made by him for White's benefit in payment of lawful charges on his goods, and that the special contract with the lessees did not vary his liability to Vann, unless the latter was informed, or had reasonable ground to believe, the special contract existed. It was held on review of the case by the Supreme Court of Tennessee, that this charge was right, as Vann had a right to rely on the custom of the country in advancing the charges.

In Bowman v. Hilton, 11 Ohio 303, the action was replevin. Bowman shipped a lot of goods from Cleveland consigned to himself care of Forsyth & Hull, Maumee City, Ohio. Forsyth & Hull had relinquished business before the goods reached Maumee; wherefore they were deposited with another firm at that place, and by said firm sent to a firm at Providence, and thence shipped by a boat, of which Hilton, the defendant, was master, to Brunersburg. Hilton paid the charges from Cleveland to Brunersburg; that is, for transportation over the entire route. When the goods were taken from Hilton's possession, they were found to be damaged about one-third their value. Hilton claimed the right to retain them for the advances made by him. The trial court instructed, in effect, that Hilton was liable for such damage as occurred by his own negligence or that of some one with whom he was in partnership, but not for damage done by anybody else while transporting the goods. The court declared that, from the general course of business and the directions on the goods, Hilton had the right to receive them from his immediate consignor and presume the owner had authorized the consignment; and to entitle him to a lien for a commission and advances, the law imposed on him no duty beyond what a prudent man, under like circumstances, would have done in the management of his own business. The judgment of the lower court was affirmed.

In Bissell v. Price, 16 Ill. 408, Price, the plaintiff

below, sued to recover advances made on certain merchandise received of J. H. Harmon & Co., who were forwarding merchants at Peru, and for freight due for transporting the merchandise from Peru to Peoria. When the goods were opened at the defendant's store, they were found to be damaged; whereupon the defendant refused to pay Price his freight and the advances he had made to Harmon & Co. for antecedent charges. It appears the damage was done before the goods came into Price's hands; and it was held on appeal, that he was not bound to examine the goods before receiving them in order to ascertain their condition, because such a course of business would be impracticable; citing Angel, Carriers, sec. 231; Bates v. Todd, 1 Mo. & Rob. 186, and Warden v. Green, 6 Watts, 424. Speaking of the rule by which a succeeding carrier can pay the charges of a previous one, the opinion says the authority to make such payments extends no further than is reasonably required by the necessities of commerce; that in making such advances for the consignee, the carrier is bound to act in good faith and with ordinary prudence in ascertaining the goods to be in good condition and the previous charges reasonable; that when he has done this, he has done all the law requires of him and the owner is bound to recognize and sanction his action in making the advances.

In Pearce v. Wabash R. R., 102 U. S. 179, it appeared that the plaintiff had shipped some boxes of curios from Japan to St. Louis in bond, the boxes not to be opened until they reached St. Louis, their destination. The purpose was to protect the articles from frontier custom house inspection. A bill of lading accompanied the shipment, by which the different carriers were notified of the terms of the contract requiring the goods to be carried to St. Louis, the port of destination, before they were opened. An intermediate carrier, the Canadian Pacific Railroad Company, for its own convenience, diverted the shipment to St. Paul where the custom house

officers examined the boxes and assessed the duty there-on at $264.31; which sum said railroad company paid in order to regain possession of the goods. The goods were afterwards delivered to another railroad company and by the latter to the Wabash Railroad Company, which carried them to St. Louis. Under its traffic arrangement the Wabash Company was responsible for the previous charges on the goods. It paid the charges and tendered the goods to the consignee at St. Louis on condition of the repayment of its advances, including the Federal imposts. If the goods had been transported to St. Louis in bond, as they should have been, they would have been opened and examined there and retained by the custom house officers until the duty was paid. But as it was, on their arrival they were found to be broken and damaged; wherefore the owner refused to pay the Wabash Company the charges advanced. Instead he replevied the property. That cause was first decided by this court in favor of Pearce, on the ground that the shipment was unlawfully diverted by the Canadian Pacific Company to St. Paul, instead of being carried in bond to St. Louis as the bill of lading required; and, therefore, the prepayment of duties at St. Paul was no necessary incident of the carriage; that, moreover, as each carrier was apprised of the contract by the bill of lading, and the goods had been damaged by a violation of the contract, every carrier into whose hands they came, had notice of the breach of the contract committed in diverting the goods from their bonded destination in St. Louis to St. Paul, where they were subject to Federal inspection; that, hence the Canadian Pacific Railroad Company was not justified in paying the duty at St. Paul, or the Wabash Company in holding the goods until the owner repaid those duties. After settling that the case involved a federal question and that import duties on goods in transit might properly be paid by a carrier, the Supreme Court of the United States held the Wabash Company was justified in paying the pre-

vious charges, including the duty, and that if Pearce had been wronged by the change of the bonded destination by the Canadian Pacific Company, he had a remedy against said company, but could not refuse to pay the Wabash what it had advanced for him. It is true Pearce would have had to pay the duty in St. Louis and that the payment by the Wabash Company enured to his benefit; but it is true, too, that the contract had been breached, in its vital feature, by changing the bonded destination of the goods, and that if it had not been breached, there would have been no duty paid in St. Paul by the Canadian Pacific Company and, hence, no lien for the duty would have existed in favor of a subsequent carrier. The goods would simply have gone, as desired, to St. Louis and Pearce would have paid the duty there himself. But the essence of the decision so far as it bears on the present controversy, is that, though the charge for import duties arose from the tort of an intermediate carrier, the final carrier who had paid the charge in good faith and without knowledge of the facts out of which it arose, was entitled to retain the goods for reimbursement. This was equivalent to holding that a final carrier is not bound to investigate, at his own risk, the origin of a lien asserted against property in transit by a preceding carrier.

Accepting this as the law when the previous charges are for freight or other common services, we come to the ultimate question of whether a good reason exists for modifying the rule when the lien asserted is one of general average. Now, instead of there being any reason for modifying the rule in a case of the latter kind, there is this additional reason for upholding it; at least in the present case. The execution of a general average bond by the owner of part of the cargo of a vessel, does not conclude such owner from setting up in defense of liability on the bond, that the wreck occured from the negligence of the owner of the vessel and is not the subject of general average. This was directly held by

the Supreme Court of Missouri in a carefully considered judgment by an accurate jurist. [See opinion by BAR-CLAY, J., in Conrad v. DeMontcourt, 138 Mo. 311 39 S. W. 805.] Perhaps in some particulars the execution of such a bond might compromise the rights of the owner of the cargo: but it does not in any way impair his right to resist payment of contribution on the ground that the expense to which he was asked to contribute, occurred from the unseaworthiness of the vessel or the crew's lack of skill, or any other cause for which the law casts the entire loss on the owner of the vessel. Such a bond is intended as a temporary expedient, a *modus vivendi;* and, as said before, is resorted to in order that the property may be delivered promptly to the consignee without depriving the shipowner of the benefit of his lien for general average or the consignee of his right to show the loss was not subject to general average. This being true, the plaintiff would have been in no way prejudiced by signing the bond; hence it would be unreasonable to allow it to throw on the defendant the responsibility of saying whether negligence caused the shipwreck and whether the plaintiff could be compelled to contribute to the consequent expense. On its face the demand for the execution of the bond was just; for the right to exact a general average bond under such circumstances is given by law, and the terms of the bond presented for plaintiff's signature were reasonable; or at least not questioned. Those terms did not attempt to commit plaintiff by an admission that the accident to the Seneca was due to a peril of navigation. The recital of the circumstances of the wreck purports only to be as "represented." Plaintiff refused to sign because the disaster was not due to a peril of the sea; but this matter the defendant was not bound to investigate. It had the right to demand a bond before delivering the cement, and leave the question of the cause of the disaster to be settled between plaintiff and the owner of the vessel.

The result is that the plaintiff wrongly refused to execute the bond, and cannot now recover for the subsequent loss of the cement by an act of God while in the defendant's custody.

We have been cited by respondent to certain cases in which carriers were denied a lien for transportation charges as against the owners of the freight, when the goods had been received for carriage, not from the owners or persons acting by authority, but from a tortfeasor who delivered the property for shipment contrary to the will and rights of the owners. [Firch v. Newberry 1 Doug. (Mich.) 11; Robinson v. Baker, 5 Cush. 137; Stevens v. R. R. Co., 8 Gray 262; Gibson v. Gwinn, 107 Mass. 126, Saltus v. Everett, 20 Wend. 267.] In our opinion the present controversy does not present the proposition determined in those adjudications.

The judgment is reversed and the cause remanded to be disposed of in accordance with this opinion.

All concur.