sum of $170, being 1 per cent. on the amount of the mortgage from May 1, 1913, till March 1, 1916, the date when the mortgage by its terms was to become due. At the time it was conceded that the defendant had paid interest till May 1, 1914, and she conceded that she owed the plaintiff 1 per cent. interest, amounting to $25, from that date till August 1, 1914, when the mortgage was foreclosed. The learned trial justice, however, held that the defendant had agreed to pay 1 per cent. interest on the amount secured by the mortgage until March 1, 1916, regardless of whether or not the mortgage was previously foreclosed.

In my opinion the interpretation which the trial justice has placed upon the defendant's obligation is not borne out by the written agreement. The defendant might have made a promise to pay 1 per cent. interest till the due date of the mortgage, but she did not do so. She agreed to pay the excess interest "during the existence of the said mortgage," and when the foreclosure was completed the mortgage ceased to exist and became merged in the judgment. Thereafter no sums, either of principal or interest, were payable under the mortgage, but all rights of the parties to the mortgage became fixed by the judgment. Consequently, by the plain terms of the defendant's agreement her obligation to pay interest on the sum secured by the mortgage during its "existence" was terminated. This contract is not only plain on its face, but it apparently secured to the plaintiff's assignor exactly what it intended to obtain. The parties evidently contemplated that the existing 5 per cent. mortgage should in effect be changed to a 6 per cent. mortgage, and the defendant should pay the additional 1 per cent. When, however, the plaintiff elected to declare the whole sum due for nonpayment of interest, then no further interest was payable under the mortgage, but interest at the rate of 6 per cent. was payable under the judgment, and consequently thereafter the plaintiff's right to interest was not affected by the rate fixed in the mortgage.

Judgment modified, by reducing the same to the sum of $25 damages, with appropriate costs in the court below, and, as thus modified, affirmed, with costs of appeal to the appellant; costs of appeal to be set off against the judgment. All concur.

---

DREYFUSS v. PENNSYLVANIA R. CO.

(Supreme Court, Appellate Term, First Department. June 14, 1915.)

1. CARRIERS ⬤⟿30—RATES—INTERMEDIATE OR CONFLICTING CHARGES.
    Where a carrier has published conflicting rates, effective contemporaneously in the same tariff, the shipper is entitled to the lower of the rates.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. § 81; Dec. Dig. ⬤⟿30.]

2. CARRIERS ⬤⟿193—CHARGES—CONFLICTING RATES.
    Where the Erie Railroad, being unable to complete transportation of a shipment, transferred the goods to the Pennsylvania Railroad, which tendered delivery to the consignee in New York, the Pennsylvania Railroad was bound to know that the lower of two conflicting rates was the proper

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

one, and could not justify a holding of the goods upon the consignee's refusal to pay the higher rate.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 348, 868, 869; Dec. Dig. ☞193.]

3. COURTS ☞489—INTERSTATE COMMERCE—AUTHORITY OF STATE COURT—APPLICATION OF PUBLISHED TARIFFS.

Where the issue was not as to the reasonableness of a rate, but as to the correct application of a published tariff, the state court had cognizance as against the contention that it was a matter to be determined by the Interstate Commerce Commission.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 404, 1324–1330, 1333–1341, 1372–1374; Dec. Dig. ☞489.]

4. CARRIERS ☞197—CHARGES—SALE OF GOODS.

Where a consignee refused to pay the freight on a shipment of onions because of a mistake in the rate charged, a day and a half or two days was not a reasonable time for the carrier to wait, after sending a corrected bill, before selling the shipment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 891–900; Dec. Dig. ☞197.]

Appeal from Municipal Court, Borough of Manhattan, Third District.

Action by David Dreyfuss against the Pennsylvania Railroad Company. From a judgment for defendant, plaintiff appeals. Reversed, and new trial ordered.

Argued April term, 1915, before GUY, BIJUR, and PENDLETON, JJ.

Maurice B. Gluck, of New York City, for appellant.

Burlingham, Montgomery & Beecher, of New York City (George R. Allen, of New York City, of counsel), for respondent.

BIJUR, J. Plaintiff was the consignee of two car loads of onions, shipped August 18, 1914, from Stockton, Cal., over a route specified in the bill of lading, concluding with carriage from Chicago to New York over the Erie Railroad. Owing to circumstances which are immaterial to the present controversy, the Erie Railroad was unable to deliver these two cars conveniently in New York City, and therefore transferred them at Waverly Transfer to the Pennsylvania Railroad, which brought them to this city. The Pennsylvania Railroad presented to the consignee a bill for transportation, which comprised a charge of 7 cents per 100 pounds, for service of the Pennsylvania Railroad, and $1.25 for the transcontinental carriage. Plaintiff at once called the attention of the Pennsylvania Railroad agent to the fact that the correct charge for the transcontinental carriage was only $1.05 per 100 pounds, and tendered the corresponding amount, namely, $1.12 per 100 pounds, which tender was refused. On the afternoon of the same day, September 3, 1914, the Pennsylvania Railroad having, on inquiry, ascertained that the lower rate was a lawful one, and that the Erie was willing to reduce the bill accordingly, delivered a "corrected bill" at 3:45 p. m. at the office of the plaintiff. No response having been received, the Pennsylvania Railroad sold the onions at auction on the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

morning of September 5, 1914, and the plaintiff sues for conversion of its goods. The defendant counterclaims for the freight charges.

[1] The first question presented for decision is the correctness of the first demanded rate. The Southern Pacific tariff, effective August 18, 1914, contains two "items," 755 and 650-A, applicable to this shipment. The former shows a rate of $125 per 100 pounds to New York and $1 to Chicago; the latter, a rate of 75 cents per 100 pounds to Chicago. Incidentally it may be remarked that on a careful 'examination there might be a question whether item 755 applies to the present case, where, as I understand it, the shipment was straight car loads of onions; but I shall assume that item 755 does apply. There was also in force on August 18, 1914, an Erie Railroad rate on onions from Chicago to New York, fifth class, of 30 cents per 100 pounds. There are thus apparently two rates applicable to the shipment in question, one a through rate of $1.25 per 100 pounds, and the other, by combination of intermediate rates, of $1.05 per 100 pounds. The Southern Pacific tariff also contains item 40-A, to which no reference is made in the briefs of either side, and which apparently was not called to the attention of the learned judge below. This item reads as follows:

"Item 40-A. If the aggregate of the intermediate rates, or the aggregate of the rates applying from points of origin to California terminals (named on pages 1 and 2), and the rates shown herein as applying from said California terminals to point of destination, makes less than the through rates named in this tariff or as supplemented, the combination rates so made will apply."

Moreover, even apart from this provision of the tariff, the Interstate Commerce Commission has held repeatedly that, where a carrier has published conflicting rates effective contemporaneously in the same tariff, the shipper is entitled to the lower of these rates. See Conference Ruling No. 239 of December 6, 1909, and references therein; also Laning-Harris Coal Co. v. M. P. R. Co., 13 Inter. Com. Com'n R. 154, 158, 159.

[2] It is therefore apparent that the only lawful rate in force to cover this shipment was the one of $1.05, and that, when the defendant refused to deliver the consignment to plaintiff unless he should pay the higher rate, it was insisting on an unlawful charge. It could not excuse itself on the theory that it had received these goods from the Erie Railroad, and was bound to pay or collect whatever the Erie charged. Defendant was as much bound to know the correct rate on the shipment which it took over as was the plaintiff. Boston & Maine R. R. Co. v. Hooker, 233 U. S. 97, 34 Sup. Ct. 526, 58 L. Ed. 868; Adams Exp. Co. v. Croninger, 226 U. S. 491, 509, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257.

The learned judge below seems to have been of opinion that the defendant was justified in collecting whatever the Erie Railroad charged, but there is no authority for this view. The two cases cited in the opinion below, which have some bearing on this question, are not in point. Berry Coal & Coke Co. v. Chicago, P. & St. L. R. R. Co., 116 Mo. App. 214, 92 S. W. 714, concerned a shipment which was not a through bill of lading, and in Glover v. Cape G. & S. Ry. Co., 95 Mo. App. 369, 69 S. W. 599, the bill of lading did not specify a route, as

it does in the case at bar. In this case, therefore, it was not possible for the final carrier to ascertain, either from the face of the papers submitted to it or by reasonable inquiry, what the appropriate rate may have been.

[3] The court below also regarded the question which rate was the lawful one as a matter to be determined by the Interstate Commerce Commission. But the issue presented here is not as to the reasonableness of a rate, of which, no doubt, the federal commission would have exclusive jurisdiction, but as to the correct application of a published tariff—a matter palpably cognizable by this court. P. R. R. Co. v. Puritan Coal Mining Co., 237 U. S. 121, 35 Sup. Ct. 484, 59 L. Ed. ——.

[4] There remains, therefore, to be considered only the effect of the conduct of the defendant in sending a "corrected bill" and the sale of these onions about a day and a half thereafter. In passing it may be remarked that the evidence is not perfectly clear as to the dates, and that plaintiff appellant has some ground for its claim that only a night intervened between the sending of the bill and the sale of the onions; but I am accepting defendant's version of the evidence. I do not think that a day and a half or two days was a reasonable time, under the circumstances, even assuming all the facts to be as defendant claims them to have been, for plaintiff to meet the corrected charge.

Apart from the fact that one of the defendant's employés testified that, if a perishable commodity is not taken away, it is sold within a reasonable time, namely *three days,* there was no adequate proof that these onions were perishable, and certainly none that they required to be disposed of in the precipitate way shown in the case at bar.

Judgment reversed, and new trial ordered, with costs to appellant to abide the event.

GUY, J., concurs

PENDLETON, J. (concurring). The action is by the consignee of certain onions against the railroad company carrier for damages for refusal to deliver. The answer is a denial, and a counterclaim for the balance due for freight.

The following facts appear to be fairly established: Plaintiff purchased the onions in California and caused them to be shipped to his order over certain connecting lines, including the Erie Railroad, to New York. The Erie, not having a downtown track connection in New York City, turned them over to defendant. The goods arrived over the latter road August 31st, and plaintiff was duly notified. Plaintiff demanded the goods, and after some controversy as to proper freight charges tendered the freight charges based on a rate of $1.05, plus 7 cents for defendant's special charges. Defendant refused to deliver, claiming the freight was $1.25, plus its 7 cents. The proper rate was the one tendered by plaintiff. Defendant ascertained this later, and so notified plaintiff, and that it would accept the lower rate. Thereafter defendant sold the goods as perishable, credited the amount realized on the freight charge as corrected, and counterclaims for the balance.

It seems clear. that the refusal to deliver the goods on the tender made by plaintiff was wrongful, and that a cause of action was then complete. The 'refusal was not qualified, as in McEntee v. N. J. Steamboat Co., 45 N. Y. 34, 6 Am. Rep. 28, but absolute, unless the larger amount .was paid. It is true Mr. Sanders, a witness for the defendant, gave some evidence claimed to indicate that at the time of the refusal he made some statement to the effect that he would consult the Erie. It appears, however, that these freight charges had been on two previous occasions insisted on as a ground for refusal to deliver, and objected to by plaintiff, and no effort appears to have been then made by defendant to consult the Erie Railroad. Taking the evidence as a whole, it seems clear that this idea of taking it up with the Erie was an afterthought, conceived subsequent to the demand and refusal, and after defendant realized that plaintiff was preparing to litigate the question.

A cause of action being complete at the time of the demand and refusal, the subsequent offer could at most be received in mitigation of damages, and as such could be effective only if the plaintiff had the usual reasonable opportunity to pay the corrected charge and receive the goods before the sale, assuming the latter to have been lawful. If there was not such reasonable time between the receipt by plaintiff of the notice of the correction in the charges and a lawful sale of the goods, the evidence in mitigation of damages manifestly fails. It is fairly clear that the tender and demand were made on September 3d; that on the same day defendant was notified by the Erie Railroad of the mistake in the charge, and "the corrected notice" sent by defendant is dated September 3d, and was delivered on the same day at plaintiff's place of business about 3:45 p. m. Defendant claims it also notified plaintiff of the correction by telephone on September 3d. The sale was made on a Saturday, September 5th. The notices of the corrected charge have stamped on them the statement that the free storage period expires within three days, "legal holidays and Sundays and day of arrival not included," and defendant's witness testified it was customary not to sell as perishable before three days. It is very clear that, taking this as a basis for determining the reasonable time within which to pay and take the goods, such had not expired at the time of sale.

Defendant urges, and the court below held, that its refusal to deliver the goods at the time of the tender was not wrongful, because it in good faith believed $1.25 to be the correct rate, relying therefor on the representations made to it by the Erie Railroad at the time it received the goods; that being the amount assessed against them on the way bill as the charges of the preceding carriers. The bill of lading issued in California did not specify the rate to be charged, and it is very clear by its own admission that the Erie had no right to collect more than $1.05, and it could not give to defendant a lien greater than it had. If defendant paid, or advanced, to the Erie on its representations more than the proper amount, its remedy is against the Erie. The shipper is not responsible for the Erie's representations, or. for mistakes as between the intermediate carriers, and is not bound to pay

excessive charges made against its goods and sue the carrier for the recovery thereof. Any such rule would compel the shipper to pay the overcharges, no matter how great or burdensome, under penalty, if he refused, or was unable so to do, of losing his property.

The cases cited by the learned court below are not in point. In Berry Coal & Coke Co. v. Chicago, Peoria & St. Louis Railway Co., 116 Mo. App. 214, 92 S. W. 714, the court specifically points out that the shipment was not under a through bill of lading as here. There are also other material distinctions between that case and the one at bar. In Glover v. Cape Girardeau & Southern Railway Co., 95 Mo. App. 369, 69 S. W. 599, no specified route was fixed by the bill of lading. In such case the court held that the initial carrier was the agent of the owner. Here the route was specified in the bill of lading. The fact that interstate traffic rates are regulated by the Interstate Commerce Commission has no bearing on this case. No question arising under the provisions of the Interstate Commerce Act [1] is here involved. The fact that the regulation of interstate traffic has been assumed by Congress does not relieve a carrier from liability for refusal to deliver on payment of the proper legal rate. What that is is a question of fact, to be determined as any other question of fact. Nor is this such an action as can only, under the provisions of the Interstate Commerce Act, be brought in the federal court, or before the Interstate Commerce Commission. Such rule of exclusive jurisdiction relates only to actions for damages for which the carrier is liable under said act, or the damages are traceable to a violation of the provisions thereof. Loomis v. Lehigh Valley R. R. Co., 208 N. Y. 312, 101 N. E. 907. Nor, properly speaking, is any question as to a proper lawful rate here involved. That the correct rate was $1.05 was conceded by the corrected notice.

That defendant sold the goods without notice to or the consent of plaintiff is conceded. It seeks to justify the sale on the ground that the goods were "perishable." The general right of a carrier to sell perishable goods rests on the implied authority from the owner to take such action as the nature of the case requires. The rule is stated in Hutchinson on Carriers as follows:

"Sec. 790. In order to justify the act of the carrier in making a sale of goods, and to establish his title to them, the purchaser must show that there was a necessity for the sale, arising from the perishable nature of the property, which made its preservation for the owner impracticable, or that, from that or some other cause, it was neither possible to proceed with its transportation nor to store it; that the carrier has acted in good faith and with sound discretion; and that it was impossible to communicate with the owner and to receive instructions from him as to the course to be pursued, without occasioning a delay which the circumstances and condition of the property would not admit. * * *

"Sec. 791. If the carrier * * * sell the goods when the necessity for so doing does not exist, he will be liable in an action for their conversion, and nothing but the existence of circumstances of actual necessity will afford an excuse for the sale. * * *"

See, also, Butler v. Murray, 30 N. Y. 88, 86 Am. Dec. 355.

Under the statute of this state, section 68 Railroad Law (Consol. Laws, c. 49) notice to the shipper is not always necessary, but proof of

[1] Act Feb. 4, 1887, c. 104, 24 Stat. 379.

the perishable quality of the goods is indispensable. While there was some difference in the evidence as to how far onions in September can be stored, it is quite evident defendant failed to prove a necessity to sell them so promptly, or that they would have deteriorated by being kept for the customary three-day period or until the usual rejection in writing by the consignee had been obtained. If the sale was not warranted, defendant thereby converted plaintiff's property, and is liable therefor, irrespective of any other question.

Judgment reversed, and new trial ordered, with costs to appellant to abide the event.