LESLIE G. LOOMIS et al., Respondents, v. LEHIGH VALLEY
RAILROAD COMPANY, Appellant.

Carriers — common-law duty of carriers to provide cars properly
equipped for the transportation of grain and farm produce in
bulk — Public Service Commissions Law and Interstate Com-
merce Law considered and differentiated — practice on appeal.

1. It is the duty of a common carrier to provide itself with vehicles
which are safe and sufficient for the purpose for which they are fur-
nished.    When the carrier solicits and receives produce for shipment
in bulk, the law implies the obligation to furnish cars which are
reasonably fit for that service, and for the failure to meet this obli-
gation the shipper may ordinarily invoke his remedy at law to
recover his loss.

2. Plaintiffs were shippers of grain over defendant's road and
were furnished ordinary freight cars which, without the addition of
bin doors or bulkheads, are not suitable for such shipments because
they cannot be loaded to the minimum capacity upon which the
freight rate is based, or the maximum which, in the interest of the
shipper, they are designed to hold.    The plaintiffs demanded that
the defendant properly equip these cars, some of which were used
in intrastate and others in interstate commerce, but the defendant
refused.    Held, that in these circumstances the plaintiffs were justi-
fied in furnishing necessary lumber for such equipment upon those
cars which were used for intrastate shipments, but that no such
recovery could be had for the equipment of the cars used in inter-
state shipments.

3. The reason for this difference in the defendant's liability is
found in the fact that so long as our state public service commis-
sion had not made any rules specifically covering the duty of com-
mon carriers to properly equip cars furnished by them, it was the
defendant's common-law duty to furnish to the plaintiffs cars that
were properly equipped for the service for which they were furnished,
without reference to rates, and the matter was one of which our
state courts had jurisdiction; it was different, however, in respect
of the cars furnished for interstate shipments, because that is a
subject which at that time had passed exclusively under the juris
diction of the Federal courts by virtue of the Interstate Commerce
Act.

4. This case is not within the reason of the rule that upon appeal
from a single judgment the appellate court must affirm or reverse

as to the whole of the recovery, and as to all of the parties.
Although there is no separation of causes of action, either in the
complaint or in the judgment, there are manifestly two such causes
which are easily separable. Plaintiffs are entitled to recover upon
one and not upon the other, and, therefore, the judgment may be
modified by sustaining the plaintiff's recovery for the cost of the
lumber used upon the cars furnished for intrastate commerce, and
disallowing the claim for the materials used on those cars which
were engaged in interstate commerce.

*Loomis* v. *Lehigh Valley Railroad Co.*, 147 App. Div. 195,
modified.

(Argued March 6, 1913; decided April 29, 1913.)

Appeal from a judgment entered November 21, 1911,
upon an order of the Appellate Division of the Supreme
Court in the fourth judicial department overruling
defendant's exceptions, ordered to be heard in the first
instance by the Appellate Division, denying a motion for
a new trial and directing judgment for plaintiffs upon
the verdict rendered in their favor at the Trial Term.

The action was brought to recover the cost of lumber
which the plaintiffs, as shippers of produce over defend-
ant's railroad, bought and used for the purpose of making
certain freight cars furnished by the defendant suitable
for such shipments. At the Trial Term the court directed
a verdict for the amount of the plaintiffs' claim, and
denied defendant's motion for the direction of a verdict in
its favor. The exceptions to these rulings were ordered
heard at the Appellate Division in the first instance, where
they were overruled, and the present appeal is from the
judgment entered upon that disposition of the case.

The plaintiffs are copartners in the business of buying,
selling and shipping grain, apples, potatoes, onions, cab-
bage and other farm products, and their principal office is
at Victor, N. Y. The defendant is a railroad corporation
organized under the laws of the state of Pennsylvania,
and is a common carrier which solicits and accepts such

products for transportation over its road from its stations at Victor, Farmington, Stanley, Mendon, Henrietta, East Rush, Cedar Swamps, Rochester Junction, Clifton Springs, North Le Roy and other places in the state of New York to other points in the United States, both within and without the state of New York. The plaintiffs buy the grain and produce from farmers who draw it to the railroad stations in their respective localities, where it is loaded into box cars for shipment in bulk. In order to load such cars to the minimum capacity upon which the freight rates are based, and the maximum to which the shipper is entitled, it is necessary that they should be equipped with grain doors or bulkheads. Grain doors consist of boards cut to the proper length for nailing on the inside of the cars at the regular doors, which are on the sides of the cars midway between the ends. The regular car doors are either of the sliding or swinging type, and the purpose of the grain doors in either case is to permit the loading of the cars to their proper capacity, to safely contain the load, and to enable the unloading to be done without unnecessary waste or inconvenience. These grain doors are sometimes called bin doors, and that characterization at once explains their use. The loading of grain and produce in bulk begins at the two ends of the cars, and as the accumulating volume seeks a level which brings it to the open doors, the bin boards are attached one after another as the load increases until the proper height is reached. Thus the produce is kept from leaking in transit, and saved from waste during the process of loading and unloading. Bulkheads served the same purpose, the only difference being that in their use the two ends of the cars are converted into two separate bins. In that case the bin boards, instead of being nailed lengthwise of the cars to close the door openings, are placed transversely of the cars on either side of these openings so as to leave a passage between them.

For many years prior to 1906 it had been the custom of the defendant to furnish cars fitted with grain doors for the shipment of produce in bulk, or the lumber from which the shipper could make grain doors or bulkheads, and for this purpose lumber had been placed from time to time at the various stations where the shipper could help himself to what he needed. The same custom prevailed on other railroads in various parts of the country.

From August, 1906, to May, 1908, the plaintiffs continued, as before, to bring to the defendants for transportation carload lots of produce to be sent in bulk, which the defendant continued to receive but for which it neglected and refused either to furnish cars fitted with grain doors or bulkheads or the lumber wherewith to construct the same, although the plaintiffs demanded proper cars for the protection and transportation of their shipments. Upon the defendant's refusal to comply with these demands, the plaintiffs bought and used the necessary lumber to construct the grain doors and bulkheads in the various cars which are enumerated in Schedule "A" annexed to the complaint. The sums thus expended averaged $1.60 per car and amounted to a total of $322.07, for which the plaintiffs presented to the defendant a statement with demand of payment which was refused. Thereupon this action was brought with the result above stated.

None of the facts essential to the plaintiffs' alleged cause of action are controverted either in the defendant's answer or in the evidence. The defendant relies upon the assertion (1) that it was under no common-law duty to furnish to the plaintiffs cars equipped with grain doors, bin doors or bulkheads, and (2) that even if such a duty had ever existed it had been abolished by the provisions of the Interstate Commerce Act of February 11th, 1887, and the Elkins Act of February 19th, 1903, and the Public Service Commissions Act of the state of New York (L.

1907, ch. 429), pursuant to which the defendant had filed tariffs of rates which contained no provision for payments or allowances to shippers for grain doors, bin doors or bulkheads placed in cars by them.

The particular sections of the Public Service Commissions Act of the state of New York (L. 1907, ch. 429) upon which the defendant relies are sections 28, 33 and 49, of which we shall quote only the pertinent parts.

. Section 28 provides for the filing and publication of tariff schedules which shall set forth, among other things, "the places between which property and passengers will be carried, and shall also contain the classification of passengers, freight or property in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the commission may require to be stated, *all privileges or facilities granted or allowed,* and any rules or regulations which may in any wise change, affect or determine any part, or the aggregate of, such aforesaid rates, fares and charges, or the value of the service rendered to the passenger, shipper or consignee."

Section 31 provides: "No common carrier shall, directly or indirectly, by any special rate, rebate, drawback, or other device or method, charge, demand, collect or receive from any person or corporation a greater or less compensation for any service rendered or to be rendered in the transportation of passengers, freight or property, except as authorized in this act, than it charges, demands, collects or receives from any other person or corporation for doing a like and contemporaneous service in the transportation of a like kind of traffic under the same or substantially similar circumstances and conditions."

Section 33 directs that "No common carrier shall charge, demand, collect or receive a greater or less or different compensation for transportation of passengers, freight or property, or for any service in connection therewith, than the rates, fares and charges applicable to such

transportation as specified in its schedules filed and in effect at the time; nor shall any such carrier refund or remit in any manner or by any device any portion of the rates, fares, or charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property except such as are regularly and uniformly extended to all persons and corporations under like circumstances."

Section 49 declares: "Whenever either commission shall be of opinion, after a hearing, had upon its own motion, or upon a complaint that the rates, fares or charges demanded, exacted, charged or collected by any common carrier, railroad corporation or street railroad corporation subject to its jurisdiction for the transportation of persons or property within the state, or that the regulations or practices of such common carrier, railroad corporation or street railroad corporation affecting such rates are unjust, unreasonable, unjustly discriminatory or unduly preferential, or in any wise in violation of any provision of law, * * * the commission shall determine the just and reasonable rates, fares and charges * * * to be charged * * *. And whenever the commission shall be of opinion, after a hearing, had upon its own motion or upon complaint, that the regulations, practices, equipment, appliances, or service of any such common carrier, railroad corporation or street railroad corporation in respect to transportation of persons or property within the state are unjust, unreasonable, unsafe, improper or inadequate, the commission shall determine the just, reasonable, safe, adequate and proper regulations, practices, equipment, appliances and service thereafter to be in force."

The foregoing excerpts from the Public Service Commissions Law of this state are, of course, germane only to the *intra*state shipments made by plaintiffs over the defendant's road; and of such shipments there are only

29 as against 172 *inter*state shipments, to which the provisions of the Interstate Commerce Act are applicable.

The various parts of the Interstate Commerce Act, and its amendments, which bear upon the contentions of the parties with reference to interstate shipments, are section 1, paragraph 1, which provides: "That the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage or handling of property wholly within one state and not shipped to or from a foreign country from or to any state or Territory."

Section 1, par. 2, which defines the term "transportation" to mean "cars and other vehicles and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof and all services in connection with the receipt, delivery, elevation and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported."

Section 6, par. 1, which provides for the filing, printing and posting of schedules of rates by common carriers which "shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges and all other charges which the commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares and charges, or the value of the service rendered to the passenger, shipper or consignee."

Section 6, par. 7, which provides that: "No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares and charges upon which the same are transported by said carrier have been filed and published in accordance with

the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

Section 9, which provides: "That any person or persons claiming to be damaged by any common carrier subject to the provisions of this act, may either make complaint to the commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such carrier may be liable under the provisions of this act in any District or Circuit Court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of such remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt."

By section 1, par. 1, of the Elkins Act, which went into effect in 1903, carrier corporations, as well as their officers and agents, are subjected to criminal prosecution and penalties for the willful failure to file and publish the tariffs or rates and charges required by the Interstate Commerce Act; and it is declared to be "unlawful for any person, persons or corporation to offer, grant or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereof whereby any such property shall by any device whatever be transported at a less

rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereof, or whereby any other advantage is given or discrimination is practiced."

In paragraph 2 of the same section of the Elkins Act it is provided that "Whenever any carrier files with the Interstate Commerce Commission, or publishes a particular rate under the provisions of the act to regulate commerce or the acts amendatory thereof, or participates in any rates so filed or published, that rate as against such carrier, its officers, or agents in any prosecution begun under this act, shall be conclusively deemed to be the legal rate, and any departure from such rate, or any offer to depart therefrom shall be deemed to be an offense under this section of the act."

Further facts appear in the opinion.

*Lyman M. Bass* and *Thomas R. Wheeler* for appellant. The defendant owed no common-law duty to furnish grain doors and bulkheads without extra charge and consequently there is no obligation on its part to reimburse the plaintiffs for lumber furnished by them for that purpose without its request. (*Beard* v. *Illinois Central R. R. Co.*, 79 Iowa, 518; *Toledo, etc., Ry. Co.* v. *Hamilton*, 76 Ill. 393; *N. W. D. Assn.* v. *Atlantic Coast Line R. R. Co.*, 14 I. C. C. 154; *Sloan* v. *St. L., K. C. & N. R. R. Co.*, 58 Mo. 220; *Killmer* v. *N. Y. C. & H. R. R. R. Co.*, 100 N. Y. 395; *Strough* v. *N. Y. C. & H. R. R. R. Co.*, 92 App. Div. 584; 181 N. Y. 533.) The courts in this state have no jurisdiction over the interstate shipments involved since Congress has legislated upon the field covering such interstate "transportation" and has created exclusive jurisdiction in the interstate commerce commission in the first instance and in the courts of the United States thereafter to adjudicate upon all the ques-

tions arising in this action relating to said interstate shipments. *(Hanley v. K. C. S. R. R. Co.,* 187 U. S. 617; *Second Employers' Liability Cases,* 223 U. S. 1; *Southern Railway Company v. Reid,* 222 U. S. 424; *T. & P. Ry. Co. v. Abilene Oil Co.,* 204 U. S. 426; *B. & O. R. R. Co. v. Ladue,* 128 App. Div. 594; *Robinson v. B. & O. R. R. Co.,* 222 U. S. 506; *McNeil v. Southern Ry. Co.,* 202 U. S. 543; *Atlantic Coast Line R. R. Co. v. Macon Grocery Co.,* 166 Fed. Rep. 206; 215 U. S. 501; *Columbus Iron & Steel Co. v. K. & M. Ry. Co.,* 171 Fed. Rep. 713; 178 Fed. Rep. 261; *Wickwire Steel Co. v. N. Y. C. & H. R. R. R. Co.,* 181 Fed. Rep. 316; *B. & O. R. R. Co. v. Pitcairn,* 215 U. S. 481; *Morrisdale Coal Co. v. Penn. R. R. Co.,* 176 Fed. Rep. 748; *Clement v. Louisville & N. R. Co.,* 153 Fed. Rep. 979; *D. & R. G. Co. v. Baer Bros. Mercantile Co.,* 187 Fed. Rep. 485.) There can be no recovery in this action for lumber furnished by plaintiffs in connection with intrastate shipments. *(N. Y. C. & H. R. R. R. Co. v. Smith,* 62 Misc. Rep. 526.)

*Edward P. White* and *John Colmey* for respondents. The lumber in question was a structural necessity which it was the duty of the defendant to furnish without charge. *(Bissell v. N. Y. C. R. R. Co.,* 25 N. Y. 442; *C., N. O. & T. P. R. Co. v. Fairbanks,* 90 Fed. Rep. 467; *Hilton Lumber Co. v. A. C. L. R. R. Co.,* 6 L. R. A. [N. S.] 225; *R. R. Co. v. Davis,* 159 Ill. 53; *Goodale v. Lawrence,* 88 N. Y. 513; *Farron v. Sherwood,* 17 N. Y. 227; *Commercial National Bank v. Sloman,* 121 App. Div. 874; *Roberts v. Ely,* 113 N. Y. 128; *Neass v. Mercer,* 15 Barb. 318; *Norton v. Coons,* 6 N. Y. 33.) The ruling of the interstate commerce commission dated June 1, 1908, furnishes no defense. The jurisdiction of the state courts is consistent with the Federal statutes and decisions relating to interstate commerce. *(C., M. & St.*

*P. R. Co.* v. *Solan,* 169 U. S. 133; *S. W. R. Co.* v. *Gramling,* 133 S. W. Rep. 1129; *W. U. Tel. Co.* v. *James,* 162 U. S. 650; *A. C. L. R. R. Co.* v. *Mazursky,* 216 U. S. 122; *G., H. & S. A. R. R. Co.* v. *Wallace,* 223 U. S. 481; *Second Employers' Liability Cases,* 223 U. S. 1; *Penn. R. R. Co.* v. *Knight,* 171 N. Y. 354; 192 U. S. 21; *N. Y., N. H. & H. R. R. Co.* v. *New York,* 165 U. S. 628; *Missouri Pacific R. Co.* v. *Larabee Flour Mills Co.,* 211 U. S. 612; *N. Y. C. & H. R. R. R. Co.* v. *Williams,* 199 N. Y. 108; *Matter of Taylor,* 204 N. Y. 135.) The plaintiffs are entitled to recover in this action for lumber furnished in connection with interstate shipments. (*N. Y. S. S. P. Assn.* v. *N. Y. C. & H. R. R. R. Co.,* 2 P. S. C. Rep. 251.)

WERNER, J. The first question to be considered is whether, independently of the Federal and State statutes, the defendant was subject to a common-law duty to its shippers to furnish them cars equipped with bin doors or bulkheads for the shipment of grain and other produce in bulk. This question need not be discussed at length. It is the settled law that a common carrier must provide itself with vehicles which are safe and sufficient for the purpose intended. (Hutchinson on Carriers, sec. 497; *Cin., N. O. & T. P. Ry. Co.* v. *Fairbanks & Co.* 90 Fed. Rep. 467; *Chicago & Alton R. R. Co.* v. *Davis,* 159 Ill. 53.) We are not now considering the matter of rates, tariffs or regulatory legislation, but the primary duty of the carrier to do that which he undertakes to do. When a carrier solicits and receives produce for shipment in bulk, the law implies the obligation to furnish cars which are reasonably fit for that service; and when the carrier fails in that duty, to the damage of the shipper, the latter may ordinarily invoke his remedy at law to recover the loss which results from the dereliction of the former. There are instances, however, in which the pre-

dicament of the shipper and the degree of the carrier's dereliction are elements to be considered in determining the remedy to be applied. When the shipper brings his produce to a country station, where there are no facilities for storage, and discovers that the carrier has furnished cars which are not fit for their intended service, but which can be made so by a trifling expenditure of labor and money, it is but reasonable that the shipper should be permitted, for the advantage of both, to perform the initial duty of the carrier, and charge it with the fair expense. Any other course would entail upon both unnecessary hardship and loss. The carrier could be mulcted in damages out of all proportion to its slight infraction of duty, and the shipper subjected to losses, under his contracts with others, not within the scope of the carrier's agreement, and thus irremediable. These considerations, and others of mutual convenience, are doubtless responsible for the long standing and practically universal custom in this part of the country of permitting the shippers of grain and produce in bulk to equip cars furnished for such service with the necessary bin doors or bulkheads when the carrier has failed to do so. The record discloses that for many years prior to 1906 it had been the custom for the defendant and of other railroads in this state to furnish shippers of grain and produce in bulk the lumber with which to convert ordinary freight cars into suitable conveyances for such shipments, and that without the addition of bin doors or bulkheads such cars are not suitable for the service. It appears that they cannot be loaded to the minimum capacity upon which the freight rate is based, or the maximum which, in the interest of the shipper, they are designed to hold. If the shipment happens to be grain, the load naturally gravitates to the level at the car doors, where the pressure may create a space through which the load is jolted out in transit. And in unloading there is

also a degree of waste and inconvenience, because a car laden with grain or other loose produce, and not equipped with bin doors or bulkheads, cannot be opened without spilling some of its contents. As to the shipments set forth in the schedule annexed to the complaint, the defendant refused, after demand by the plaintiffs, to equip its cars with the necessary appliances. Without them the cars were practically useless. We think that, in these circumstances, the plaintiffs were justified in furnishing the necessary lumber, and that for the concededly reasonable expense incurred by them they are entitled to recover from the defendant, unless the provisions of our Public Service Commissions Law or of the Interstate Commerce Act have established a different rule.

In view of the legislation to which we have referred, the subject under discussion naturally divides itself into two distinct branches. The one relates to intrastate shipments, and the effect of our state legislation upon the common-law rights and obligations of the parties, and the other refers, of course, to interstate transportation, in respect of which the effect of the Federal statutes is to be considered.

The defendant relies upon certain provisions of the Public Service Commissions Law to exempt it from the liability to which it has thus far been held for the expense which the plaintiffs incurred in fitting, for bulk shipments of grain and other produce, the 29 cars which were used in intrastate traffic. We are referred to parts of sections 28, 31 and 49 of the act, which we have quoted; but we find in them nothing which is directly controlling of the question. Section 28 deals with the matter of publishing tariff schedules, which shall "state separately all terminal charges, storage charges, icing charges, and all other charges which the commission may require to be stated, *all privileges or facilities granted or allowed,*" and any rules or regulations which may affect or

determine rates, "or the value of the service rendered to the * * * shipper." Section 31 forbids unjust discrimination, rebate, drawback, or other device by which one shipper may be favored in service or charges over other shippers in similar conditions; and section 49 provides that "whenever the commission shall be of opinion, after a hearing, had upon its own motion or upon complaint, that the regulations, practices, equipment, appliances, or service of any such common carrier * * * in respect to transportation of * * * property within the state are unjust, unreasonable, unsafe, improper or inadequate, the commission shall determine the just, reasonable, safe, adequate and proper regulations, practices, equipment, appliances, and service thereafter to be in force," etc. A closer view of these sections reveals their inapplicability to the precise question here involved. This is not a case of unjust discrimination against the shipper; nor yet a case in which there has been a hearing by the commission, either upon its own motion or upon complaint, as to the practices, equipment or service of the carrier; nor even a case in which there was any action by the commission arising out of the carrier's failure to promulgate tariff schedules stating, among other things, the "privileges or facilities granted or allowed" to the shipper. We are concerned in this action with the antecedent duty of the carrier to furnish "sufficient and suitable cars for the transportation of such freight in carload lots (Section 37) with reference to which the commission had not acted at the time when this controversy arose. Primarily the question is not one of rates or regulation at all, but of the carrier's failure to perform its initial duty to give the shipper cars fit for the service for which they were furnished. That is obviously a duty with reference to which the commission has power to make rules and regulations, and even rates, but until it acts within the scope of its

powers the subject is one of which our courts have cognizance under the general rules of law. Except for the small amount involved in this branch of the case the question is of merely academic interest, for the commission has since had a hearing upon the complaint of. the New York State Shippers Protective Association against this defendant, impleaded with other railroad corporations, and has decided that "the legal duty of the carrier to furnish a suitable car for the transportation of either grain, potatoes or other bulk produce, includes provision of a proper inside guard for the carload." Under that decision, which was rendered in November, 1909, all common carriers of such bulk shipments are now required to furnish cars equipped with inside or grain doors, bulkheads, or other proper devices, so that loading or unloading may be accomplished with reasonable facility; or, in the alternative, if the carrier and the shipper deem their convenience best served by allowing the shipper to furnish these appliances, the carrier may make a stated allowance therefor, not less than the full average cost thereof, which shall be stated in its published tariffs, and shall leave to the shipper the option to supply either grain doors or bulkheads. In common with other carriers within the state, the defendant has so amended its tariff schedules as to comply with this decision, and the commission has fixed the rates with reference to this practice. The question is now one of rates, because the commission, acting within the range of its powers, has made it so. The carrier is given the alternative of furnishing a car suitable for shipment of bulk produce, or of permitting the shipper to do so, but in either event the tariff schedules filed by the carrier must disclose the uniform charges in the one instance, and the uniform allowance in the other. This power of fixing rates and making regulations concerning intrastate traffic is clearly within the jurisdiction of our state public service commission,

but their determinations are not retroactive. It is true that the commission did not act until November, 1909, with reference to the shipment of cars used in intrastate shipments of produce in bulk, but it is that very fact which, in our judgment, left unaffected the jurisdiction of our state courts to deal with the question until the commission had exercised its power over the subject. These views lead to the conclusion that the plaintiffs are entitled to recover the money expended by them in equipping with grain doors and bulkheads the intrastate cars set forth in the schedule annexed to the complaint.

The view which we are to take of the rights of the plaintiffs in respect of their interstate shipments is necessarily governed by considerations entirely different from those which have led to our conclusion as to the intrastate shipments. Here we are upon different ground, for we are now dealing with Federal statutes and with the decisions of Federal courts in demarking their effect and interpretation. If the subject is covered by the enactments of Congress, and if the Federal courts or tribunals are invested with jurisdiction over it, our jurisdiction is at an end, without regard to what it may have been at common law or under our own statutes. The first thing to be noticed is that the Interstate Commerce Act and the acts auxilliary thereto are much more comprehensive and drastic than our Public Service Commissions Law. Section 2 of the Interstate Commerce Act defines the term "transportation" as meaning "cars and other vehicles and all instrumentalities and facilities of shipment and carriage" and all services in connection therewith and in the "handling of the property transported." Section 6, par. 1, directs the making, printing, filing and posting of tariff schedules "which shall plainly state the places between which property * * * will be carried, * * * the classification of freight in force, * * * all terminal charges, storage

charges and icing charges, *and all other charges which the commission may require, all privileges or facilities granted or allowed.*" The same section, par. 7, prohibits any carrier from engaging in interstate traffic unless the tariff schedules have been promulgated as stated, and forbids any different or other charge or compensation than the published rate, or the taking of any different rates than those specified. Section 1, par. 2, of the Elkins Act subjects all corporations and their officers and agents to prescribed penalties for any violation of any of the foregoing provisions, and paragraph 2 of the same section makes it a punishable offense to even offer to depart from the rates thus established. Section 9 of the Interstate Commerce Act provides: "That any person or persons claiming to be damaged by any common carrier subject to the provisions of this act *may either make complaint to the commission* as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damage for which such common carrier may be liable under the provisions of this act, *in any district or circuit court of the United States of competent jurisdiction;* but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt." There are other sections of the statutes which have a bearing, but we have quoted enough to make it clear that the general subject is one of which the Congress of the United States has assumed control. It has enacted a statute giving to any person claiming to have been damaged by any carrier subject to the act, his choice of two tribunals in which his grievance may be considered and decided. He may go in the first instance to the Interstate Commission, or he may sue in the Federal courts, but he must choose between these two. Congress has not only acted in the premises, but it has prescribed in terms

which indicate an intention to exclude all others, the
tribunals to which the claimant must address himself.
This is what accentuates the distinction between the
interstate and the intrastate questions. In this state,
under our own statute, the question is whether our com-
mission has acted upon a subject which, although involv-
ing the common-law duty of furnishing proper cars, could
be brought into the sphere of rates by proper administra-
tive action; and that, as we have seen, was not done until
after the period covered in the complaint. Under the
Federal statute, the question is not whether the Interstate
Commission has acted, but whether Congress has assumed
such control of this feature of interstate commerce as to
divest our state courts of the jurisdiction which they had
before the Federal statutes were enacted. Upon that ques-
tion there is little we can say, except to cite the decisions
of the Supreme Court which very plainly speak for them-
selves. In the recent case of *Chicago, R. I. & Pac. Ry.
Co.* v. *Hardwick Farmers' Elevator Co.* (226 U. S. 426)
that court considered the effect of the Interstate Com-
merce Act, upon the Minnesota Reciprocal Demurrage
Law under which railroad carriers were subjected, upon
the demand of the shipper, to a demurrage charge of $1.00
per car for each day's delay in furnishing cars, and also a
reasonable attorney's fee. In discussing the Interstate
Commerce Act and its effect upon the Minnesota
statute, Chief Justice WHITE spoke for the court as
follows: " As legislation concerning the delivery of cars
for the carriage of interstate traffic was clearly a matter
of interstate commerce regulation, even if such subject
was embraced within that class of powers concerning
which the state had a right to exert its authority in the
absence of legislation by Congress, it must follow in con-
sequence of the action of Congress to which we have
referred that the power of the state over the subject-
matter ceased to exist from the moment that Congress

exerted its paramount and all-embracing authority over the subject. We say this because the elementary and long-settled doctrine is that there can be no divided authority over interstate commerce and the regulations of Congress on that subject are supreme. It results, therefore, that in a case where from the particular nature of certain subjects the state may exert authority until Congress acts under the assumption that Congress by inaction has tacitly authorized it to do so, action by Congress destroys the possibility of such assumption, since such action, when exerted, covers the whole field and renders the state impotent to deal with a subject over which it had no inherent but only a permissive power." (p. 435.)

To the same effect is the case of *Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.* (204 U. S. 426) where the question was one of rates. The syllabus very succinctly paraphrases the opinion as follows: "The Interstate Commerce Act was intended to afford an effective and comprehensive means for redressing wrongs resulting from unjust discriminations and undue preference, and to that end placed upon carriers the duty of publishing schedules of reasonable and uniform rates; and, consistently with the provisions of that law, a shipper cannot maintain an action at common law in a State Court for excessive and unreasonable freight rates exacted on interstate shipments where the rates charged were those which had been duly fixed by the carrier according to the act, and had not been found to be unreasonable by the Interstate Commerce Commission." The same rule was laid down in *Southern Ry. Co. v. Reid* (222 U. S. 424) where there was a conflict between the Interstate Commerce Law and a statute of North Carolina imposing a penalty upon carriers for any refusal to receive freight at any regular station or to forward the same by a route selected by the person tendering the same; and in *Northern Pac.*

*Ry. Co.* v. *Washington* (222 U. S. 370, 378) it was held that the "Hours of Service Law" applicable to railroads engaged in interstate traffic, passed by Congress in 1907, although not to take effect for a year after its enactment, at once superseded the state statutes relating to the subject. Here again the Supreme Court, speaking through Chief Justice WHITE, announced it as "elementary * * * that the right of a State to apply its police power for the purpose of regulating interstate commerce * * * exists only from the silence of Congress on the subject, and ceases when Congress acts on the subject or manifests its purpose to call into play its exclusive power."

It would add to the discussion nothing but increased length to quote more from the many cases which deal with this subject. We cite a few which fully sustain the foregoing expressions of the Supreme Court, and others which clearly show that the subject-matter involved in the case at bar is regarded as being under the control of the Federal commission. (*McNeill* v. *Southern Ry. Co.*, 202 U. S. 543; *Atlantic Coast Line R. Co.* v. *Macon Grocery Co.*, 166 Fed. Rep. 206; affd., 215 U. S. 501; *B. & O. R. R. Co.* v. *Pitcairn Coal Co.*, 215 U. S. 481; *Morrisdale Coal Co.* v. *Penn. R. R. Co.*, 176 Fed. Rep. 748; *Clement* v. *Louisville & N. R. R. Co.*, 153 Fed. Rep. 979; *D. & R. G. R. R. Co.* v. *Baer Bros. Mer. Co.*, 187 Fed. Rep. 485.) Neither would it be profitable to dwell at length upon the difference, contended for by plaintiff's counsel, between a question of rates and a carrier's common-law duty to furnish cars suitable for the traffic in which he engages. Conceding its existence and admitting the abstract soundness of the argument, the fact remains that Congress has made it a question of rates over which the Interstate Commerce Commission has exclusive control, and in respect of which any justiceable controversey is referred exclusively to the Federal courts.

There are many cases in which the state courts may enforce a right of action arising under an act of Congress, but only when the act expressly confers such jurisdiction or is silent upon the subject. This rule and the reasons upon which it rests are well stated in *Galveston, H. & S. A. Ry. Co.* v. *Wallace* (223 U. S. 481, 490): "Statutes have no extra-territorial operation, and the courts of one government cannot enforce the penal laws of another. At one time there was some question both as to the duty and power to try civil cases arising solely under the statutes of another State. But it is now recognized that the jurisdiction of State Courts extends to the hearing and determination of any civil and transitory cause of action created by a foreign statute, provided it is not of a character opposed to the public policy of the State in which the suit is brought. *When the statute creating the right provides an exclusive remedy, to be enforced in a particular way, or before a special tribunal, the aggrieved party will be left to the remedy given by the statute which created the right.* But jurisdiction is not defeated by implication. And, considering the relation between the Federal and the State governments, there is no presumption that Congress intended to prevent state courts from exercising the general jurisdiction already possessed by them, and under which they had the power to hear and determine causes of action created by Federal Statute." That was written in a case involving the liability of an initial carrier for non-delivery of goods by the connecting carrier, and in which it was held that the damages caused by the failure to deliver the goods were not traceable to a violation of the Interstate Commerce Law. To the same effect are *Missouri Pac. Ry. Co.* v. *Larabee Flour Mills Co.* (211 U. S. 612) and *N. Y., N. H. & H. R. R. Co.* v. *New York* (165 U. S. 628). In the *Second Employers' Liability Cases* (223 U. S. 1, 57) the jurisdiction of the state courts under

the Federal Employers' Liability Law was recognized upon the distinct ground that the statute gave the Circuit Courts of the United States jurisdiction that is not exclusive, but only concurrent with the jurisdiction of the courts of the several states.

We have yet to consider whether we can divide the single judgment recovered by the plaintiffs, so as to sustain that part predicated upon the intrastate shipments, and to disallow for lack of jurisdiction that part which rests upon the interstate shipments. The general rule in actions at law is that upon appeal from a single judgment the appellate court must affirm or reverse as to the whole of the recovery and as to all the parties. (*Goodsell* v. *Western Union Tel. Co.*, 109 N. Y. 147; *Wolstenholme* v. *Wolstenholme File Mfg. Co.*, 64 id. 272; *Nat. Bd. of Marine Underwriters* v. *Nat. Bank of the Republic*, 146 id. 64.) The reason of the rule is that it would produce endless confusion and embarrassment in the administration of justice to permit single causes of action and judgments to be split up so that different parts thereof could be in litigation in different courts at the same time. We do not think this case is within the reason of the rule. Although there is no separation of causes of action either in the complaint or in the judgment, there are manifestly two such causes if we are right in holding that there is a distinction between intrastate shipments and interstate shipments. They are easily separable. The result of our decision is that the plaintiffs are entitled to recover upon one and not upon the other. In these circumstances it is both logical and just to make an end to the litigation by directing that the judgment shall be reduced to $64.45, and as thus modified affirmed, without costs of this appeal to either party. (*Wolstenholme* v. *Wolstenholme File Mfg. Co.*, *supra;* *Board of Underwriters* v. *Nat. Bank of the Republic*, *supra.*)

GRAY, J. (dissenting). I am of the opinion, if, as it is conceded, the common-law duty of the defendant in this case extended to the furnishing of cars sufficiently equipped for the carriage of the plaintiff's produce, that the obligation existed at the place of shipment and was enforceable, whatever the destination of the freight. The argument that the interstate commerce acts confer exclusive jurisdiction upon the Federal courts to determine claims and cases of infractions of agreements relating to shipments beyond state lines does not impress me as sound in its application to the present case. I think that the courts of this state did not lose their jurisdiction to enforce the obligation, which arose, or was implied, in the transaction between the parties. In the cases decided by the United States Supreme. Court, to which Judge WERNER refers in his opinion, the states had enacted laws which operated in regulation of the duties and obligations of carriers of interstate traffic. This case does not present a question where the state has undertaken to exert its authority over subject-matters, which, by congressional action, had been brought within Federal control.

For these reasons, briefly, I dissent.

CULLEN, Ch. J., WILLARD BARTLETT, CHASE, COLLIN and HOGAN, JJ., concur with WERNER, J.; GRAY, J., reads dissenting opinion.

Judgment accordingly.